O
JS-6

# United States District Court
# Central District of California

| | |
|---|---|
| OLIVIA GONZALES, | Case № 2:15-cv-01499-ODW-FFM |
| Plaintiff, | |
| v. | **ORDER GRANTING** |
| CAREMORE HEALTH PLAN, INC.; and | **DEFENDANT'S MOTION FOR** |
| DOES 1–100, inclusive, | **SUMMARY JUDGMENT [40]** |
| Defendants. | |

## I.   INTRODUCTION

Plaintiff Olivia Gonzales filed this action against Defendant CareMore Health Plan, Inc. ("CareMore"), alleging national origin discrimination, intentional infliction of emotional distress, and defamation.  CareMore moves for summary judgment, arguing, *inter alia*, that Plaintiff failed to present any admissible evidence showing a genuine dispute for trial.[1]  The Court agrees and finds that CareMore is entitled to judgment as a matter of law.[2]  (ECF No. 40.)

---

[1]    After considering all the arguments in support of and in opposition to Plaintiff's and CareMore's evidentiary objections (ECF Nos. 47, 48-2, 48-3), to the extent this Court relies on the offered facts in this Order, the parties' objections are overruled.

[2]    After considering the papers filed in support of and in opposition to the Motion, the Court deems the matter appropriate for decision without oral argument.  Fed. R. Civ. P. 78(b); C.D. Cal. R. 7-15.

## II.   FACTUAL BACKGROUND

*Pro se* Plaintiff Olivia Gonzales was born in the Philippines, moved to the United States in 1998, and became a United States citizen in 2007.   (Uncontested Facts ("UF") 13–15, ECF No. 40-2.)   On November 19, 2012, CareMore Health System ("Health System") hired Plaintiff as an IT Data Analyst, where she was charged with fulfilling the informational needs of internal and external clients.  (*Id.* 4, 5, 16.)  However, Plaintiff states (without presenting any admissible evidence) that it was Health System's subsidiary, Defendant CareMore, that hired her.  (Opp'n to Mot. for Summ. J. ("Opp'n") 3, ECF No. 36.)

CareMore is a wholly-owned subsidiary of Health System.  (UF 1.)  CareMore provides Medicare Advantage plans and Neighborhood Care Centers to seniors in select California markets.  (*Id.* 2.)  Health System, on the other hand, is a private company that provides support services, including human resources and information technology support, to CareMore.  (*Id.* 3.)

Plaintiff reported to Felix Orito, a Health System IT Business Intelligence Manager who, like Plaintiff, is of Filipino decent.  (*Id.* 17–18.)  Saurin Mehta, also a Health System IT Business Intelligence Manager, worked as a "lead" in Plaintiff's department and assigned work as needed.  (*Id.* 19.)

After Plaintiff was hired, Health System began utilizing the services of two individuals, Yugandhar Chaparala and Venu Lingamaneni, who were employed by a third-party on a contract basis.  (*Id.* 24–25.)  In total, eighteen people comprised Plaintiff's department, four of whom Plaintiff believes are from India, including Chaparala and Lingamaneni.  (*Id.* 26.)

Almost immediately after her hire, Plaintiff began openly discussing other employees' race and national origin and engaging in the following communications with co-workers and supervisors:

- Plaintiff sent an Instant Message to Mehta asking whether a supervisor was Persian or Indian and stating that she thought he was Persian because

"he looks like alladin [sic]." (*Id.* 31.)

- Plaintiff sent an Instant Message to Lingamaneni stating: "there are so many indians standing around, doing nothing." (*Id.* 32.)
- Plaintiff sent an Instant Message to Lingamaneni stating: "indian men are paid dowry, right?  they think women should pay them, right? . . .  but the society still looks down at women, their society." (*Id.* 33.)
- Plaintiff sent an Instant Message to Mehta stating: "i read somewhere that indian men are given dowry so they feel a little special.  they probably think women are born to serve them. . . . ponder about that, it might be a cultural thing for you." (*Id.* 34.)
- Plaintiff sent an Instant Message to Mehta calling Lingamaneni a "back stabbing a-hole." (*Id.* 36.)
- Plaintiff chased Mehta after he picked up a printout from the printer and, "in front of everyone," aggressively said, "Give me my printout."  She then grabbed it from him and said, "Stop taking printout from me, that's so unprofessional." (*Id.* 37.)

In June 2013, Orito met with Plaintiff to discuss professionalism in the workplace.[3]  (*Id.* 38.)  As a result, Orito suggested that Plaintiff meet with Human Resources to discuss her concerns regarding the other employees.  (*Id.* 44.)  Plaintiff failed to do so.  (*Id.* 45.)

Nonetheless, Marytza Mega, a Health System Human Resources Business Partner, contacted Plaintiff and asked for additional details regarding her concerns.  (*Id.* 46.)  They discussed Lingamaneni's absenteeism and Orito's treatment of her.  Plaintiff stated that Orito yelled at her, made untrue statements about her being a racist, and attacked her beliefs.  (*Id.* 48–50.)  At the time, Plaintiff did not feel that she

---

[3] During the meeting, Plaintiff expressed: (1) that she believed Mehta was "listening to everything [she does]" and not doing his job (UF 40); (2) that Mehta instructed Chaparala to help her, and when he touched her computer mouse, she told Chaparala she did not need his help and screamed at him to go home (*Id.* 41–42); and (3) that she believed Lingamaneni was taking excessive breaks (*Id.* 43).

was being discriminated against because of her national origin.  (*Id.* 52.)

Mega and another Human Resources employee met with Plaintiff again to discuss her behavior and her concerns regarding her co-workers.  (*Id.* 53.)  During this meeting, Plaintiff complained that Mehta was "promoting his own kind" and presenting her work as his own and/or allowing Chaparala to do so.  (*Id.* 53.)  Plaintiff also stated that Mehta stole a document she printed for Human Resources that contained a list of charges against him and other co-workers.  (*Id.*)  Plaintiff again complained of Orito's yelling.  (*Id.*)

To address Plaintiff's conduct, as well as her assertion that it was driven by her co-workers' behavior, Health System conducted a sexual harassment and racism in the workplace training on August 15, 2013.  (*Id.* 56–57.)  Health System provided participants, including Plaintiff, a handout entitled "Professional Work Environment." (*Id.* 58.)  Portions of Health System's E-Mail and Messaging Acceptable Use Policy ("E-Mail Usage Policy") were quoted in the handout, including the portion that prohibits the use of another registered user's e-mail account.  (*Id.* 59.)  Plaintiff understood that the E-Mail Usage Policy applied to her and that, per the policy, using another employee's computer to send an e-mail was grounds for termination.  (*Id.* 28, 30.)

Three weeks later, on September 5, 2013, Plaintiff accessed Lingamaneni's computer while he was away from his desk and, using his e-mail account, sent an e-mail purportedly from Lingamaneni to Myers, Health System's CIO, stating "Im [sic] missing for hours."  (*Id.* 60–61.)  Myers and Mega conducted an investigation, and both concluded that it was Plaintiff, not Lingamaneni, who sent the September 5, 2013 e-mail.  (*Id.* 66.)  Plaintiff admitted that she did not have permission to use Lingamaneni's computer at the time, and that her actions violated company policy and were grounds for her immediate termination.  (*Id.* 62–65.)  Plaintiff later stated that she acted as such to prove a point—that Lingamaneni constantly violated HIPAA regulations by keeping his computer unlocked.  (Opp'n 10.)

Myers, in consultation with Rajan Shah, the Senior Technology Manager who supervised Orito, and with approval from Mega, made the decision to terminate Plaintiff's employment for violating the E-Mail Usage Policy. (*Id.* 67.)  Mega, Shah, and James Duval, the Director of IT, met with Plaintiff on September 12, 2013 to advise her of her termination. (*Id.* 68.)  At the termination meeting, which lasted about twenty minutes, Plaintiff did not allege that she felt discriminated against based on her national origin. (*Id.* 69.)  Plaintiff is not aware of any other employee who similarly violated the E-Mail Usage Policy; nor are Myers and Mega. (*Id.* 82–84.)

After her termination, Plaintiff filed a charge with the United States Equal Employment Opportunity Commission ("EEOC"), alleging discrimination based on national origin and retaliation. (*Id.* 87, 89.)  The EEOC investigated Plaintiff's allegations and concluded there was insufficient evidence to find a violation of law. (*Id.* 88.)

### III.   PROCEDURAL BACKGROUND

On March 2, 2015, Plaintiff filed her original Complaint in this Court. (ECF No. 1-1.)  Before serving CareMore, Plaintiff filed a First Amended Complaint and then a Second Amended Complaint. (ECF Nos. 8, 11.)  Each iteration contains claims for alleged violations of federal immigration law, both civil and criminal. (*Id.*)  On October 22, 2015, the Court dismissed all of Plaintiff's immigration claims, as this Court is not the proper forum to debate or set federal immigration policy. (Order Granting Def.'s Mot. to Dismiss, ECF No. 23.)

On January 23, 2015, Plaintiff filed her Third Amended Complaint. (ECF No. 34.)  Even though the Court stripped Plaintiff's immigration-based causes of action, her current Third Amended Complaint still asserts allegations of CareMore's general immigration improprieties. (ECF No. 34.)  The immigration claims notwithstanding, the operative complaint contains only three remaining claims: employment discrimination based on national origin, intentional infliction of emotional distress,

1    and defamation.  (*Id.*)

2    On July 7, 2016, CareMore moved for summary judgment.  (ECF No. 40.)

3    Plaintiff timely opposed, and CareMore timely replied.  (ECF Nos. 24–25.)  This

4    Motion is now before the Court for consideration.

5

6    ## III.   LEGAL STANDARD

7    Summary judgment should be granted if there is no genuine dispute as to any

8    material fact and the moving party is entitled to judgment as a matter of law.  Fed. R.

9    Civ. P. 56(a).  The moving party bears the initial burden of establishing the absence of

10   a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24

11   (1986).  Once the moving party has met its burden, the nonmoving party must go

12   beyond the pleadings and identify specific facts through admissible evidence that

13   show a genuine dispute for trial.  *Id.*; Fed. R. Civ. P. 56(c).

14   A disputed fact is "material" where the resolution of that fact might affect the

15   outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477

16   U.S. 242, 248 (1968).  Conclusory or speculative testimony in affidavits and moving

17   papers is insufficient to raise genuine issues of fact and defeat summary judgment.

18   *Thornhill's Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).  Moreover,

19   there must be more than a mere scintilla of contradictory evidence.  *Addisu v. Fred*

20   *Meyer*, 198 F.3d 1130, 1134 (9th Cir. 2000).  Where the moving and nonmoving

21   parties' versions of events differ, courts are required to view the facts and draw

22   reasonable inferences in the light most favorable to the nonmoving party.  *Scott v.*

23   *Harris*, 550 U.S. 372, 378 (2007).  A court may not weigh conflicting evidence or

24   make credibility determinations.  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978,

25   984 (9th Cir. 2007).

26

27   ## IV.   DISCUSSION

28   CareMore argues that all of Plaintiff's claims must fail because it cannot be

6

1    held liable for the alleged acts of its parent company, Health System. (Def.'s Mot. for
2    Summ J. ("Mot.") 11–12, ECF No. 40-1.) Moreover, even if Plaintiff could impute
3    the conduct of Health System to CareMore, CareMore argues that Plaintiff's claims
4    fail as a matter of law because there is no evidence to support a claim for
5    discrimination or intentional infliction of emotional distress. (*Id.* 12–21.) Lastly,
6    CareMore states that Plaintiff's defamation claim is time-barred. (*Id.* 22.) The Court
7    agrees and finds that summary judgment should be entered in favor of CareMore.

8    **A.    CareMore and Health System**

9         CareMore argues that all of Plaintiff's claims should be dismissed because
10   Plaintiff was never employed by CareMore, and she cannot demonstrate that
11   CareMore engaged in or is liable for any of the alleged wrongful conduct. (Mot. 11–
12   12.) The Court agrees.

13        As Plaintiff admits in her deposition, and Amy Welzer, Health System's Senior
14   Human resources Manager, confirms, Plaintiff was employed by Health System, not
15   its subsidiary CareMore. (UF 1, 4.) Likewise, all of the alleged bad actors and all of
16   the individuals who made decisions regarding Plaintiff's employment—Myers, Shah,
17   Mega, Orito, Mehta, and Duval—were employed by Health System. (*Id.* 7–12.)

18        Indeed, at the outset of this litigation, CareMore advised Plaintiff and the Court
19   that it was not Plaintiff's employer.   (Mot. to Dismiss 1, ECF No. 13-1; Answer to
20   Second Am. Compl. ¶ 37, ECF No. 24; Answer to Third Am. Compl. ¶ 34, ECF No.
21   35.) However, Plaintiff has done nothing to correct her admitted mistake, and is still
22   trying to impose liability on CareMore for the alleged acts of its corporate parent
23   without having identified a legal basis for liability.

24        The fact that Plaintiff was not employed by CareMore is fatal to her Title VII
25   claim, which requires "'some connection with an employment relationship.'"
26   *E.E.O.C. v. Pac. Mar. Ass'n*, 351 F.3d 1270, 1273 (9th Cir. 2003) (*quoting Anderson*
27   *v. Pac. Mar. Ass'n*, 336 F.3d 924, 930 (9th Cir. 2003)) (holding that plaintiff could not
28   prevail on her Title VII claim against defendant where defendant was not plaintiff's

1    employer, was not the entity performing the discriminatory act, and did not have the
2    right to hire, supervise, or fire plaintiff).  Given that Plaintiff, her supervisor, and the
3    alleged bad actors were all employed by Health System, Plaintiff's Title VII claim
4    against CareMore fails as a matter of law.   Similarly, Plaintiff's defamation and
5    intentional infliction of emotional distress claims fail as a matter of law because
6    Plaintiff failed to identify a legal basis for liability holding CareMore responsible for
7    the alleged acts of its corporate parent.

8         The Court hereby **GRANTS** summary judgment in favor of CareMore;
9    however, in order to spare this Court from Plaintiff's claims in any subsequent filings,
10   it will also analyze each of Plaintiff's claims and summarily dismiss them on the
11   merits as well.

12   **B.    Discrimination**

13        CareMore argues that, even if Plaintiff could impute the conduct of Health
14   System to CareMore, Plaintiff's claim for discrimination still fails as a matter of law.
15   (Mot. 13–14.)   To start, CareMore contends that Plaintiff cannot establish a *prima*
16   *facie* claim of discrimination on the basis of national origin because no reasonable
17   jury could find that a discriminatory motive was a contributing factor to her
18   termination.  (*Id.*)  CareMore also argues that it had a legitimate, non-discriminatory
19   reason for terminating Plaintiff, and that there is insufficient evidence for a jury to
20   conclude that such reason was merely a pretext for the termination.  (*Id.* 15.)

21        Title VII makes it an unlawful employment practice to discriminate on the basis
22   of race or national origin.  *See* 42 U.S.C. § 2000.  A claim under Title VII is analyzed
23   using the traditional burden-shifting analysis for discrimination claims.  *McDonnell*
24   *Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973).  That is: (1) the plaintiff must
25   establish a prima facie case of discrimination; (2) the defendant must then provide a
26   legitimate, nondiscriminatory explanation for its acts; and (3) the plaintiff must show
27   that this explanation is merely a pretext for the discrimination.  *Id.*   To establish a
28   *prima facie* case of race or national origin discrimination, Plaintiff must show (1) she

1    was a member of a protected class; (2) she was performing competently in her
2    position; (3) she suffered an adverse employment action; and (4) some circumstance
3    that suggests a discriminatory motive. *Id.* Failure to allege "specific facts" that
4    establish the existence of a *prima facie* case renders a grant of summary judgment
5    appropriate. *Palmer v. United States*, 794 F.2d 534, 536–39 (9th Cir. 1986).

6    **1.    *Prima Facie* Case**

7    CareMore argues that Plaintiff cannot establish the fourth element of a *prima*
8    *facie* case, as the undisputed evidence defeats any suggestion that Health System's
9    actions were motivated by the fact that Plaintiff is "non-Indian." (Mot. 13.)  The
10   Court agrees.

11   Plaintiff believes that Duval, Orito, and Mehta discriminated against her based
12   on her national origin. (*Id.* 71.)  Her termination was allegedly discriminatory
13   because, during her termination meeting, Duval stated that he "was just hoping [she]
14   would fit the culture." (*Id.* 72.)  Plaintiff assumes—without any evidence—that Duval
15   meant Indian culture. (*Id.*)  Plaintiff offers no other evidence to show that Orito or
16   Mehta were involved in her termination decision. (*Id.* 73, 74.)  (In actuality, the
17   termination decision was made by Myers, who is Caucasian and an American citizen,
18   after consultation with and approval from Shah and Mega. (*Id.* 23, 67.))  Lastly,
19   Plaintiff concedes that she has no reason to believe that Myers has any animus toward
20   her. (*Id.* 75.)

21   Even if Orito and Mehta were somehow involved in the termination decision,
22   Plaintiff testified that it was Orito and Mehta who hired her just ten months earlier—
23   which seriously undermines any inference that they harbored discriminatory animus
24   against her. (*Id.* 20–21.)  *See Coghlan v. Am. Seafoods Co. LLC*, 413 F.3d 1090, 1098
25   (9th Cir. 2005) (courts must take into account on a summary judgment motion the
26   same-actor inference, which arises when the same person is responsible for hiring and
27   then firing a plaintiff within a short period of time, creating a "strong inference" that
28   there was no discriminatory action).  Plaintiff likewise has no evidence that Duval

harbored any discriminatory animus toward her or other "non-Indians." (*Id.* 72.)

Indeed, Plaintiff's own testimony establishes a decided absence of any discriminatory animus in her department toward "non-Indians," like herself. Plaintiff conceded that the other thirteen "non-Indian" employees in her department did not suffer any discrimination (because of their national origin or otherwise), again undermining Plaintiff's assertion that she was discriminated against *because of* her national origin. (*Id.* 26, 76.) In fact, Plaintiff testified that two other department employees of Indian descent were either fired or left the company during her tenure, one of which Plaintiff believes was fired *because he is Indian*, and therefore posed as competition for a management position. (*Id.* 77–80.) When asked if she believes that if she were Indian she would not have been fired, Plaintiff replied "I don't say that." (*Id.* 81.) With no evidence to support her contentions, Plaintiff has failed to establish that Health System's decision to terminate her employment was motivated by the fact that she is not of Indian descent.

Again assuming that Plaintiff *could* establish discriminatory intent, Health System can easily point to a legitimate, non-discriminatory reason for her termination. The undisputed facts establish that Plaintiff accessed Lingamaneni's computer without permission and used it to send an e-mail purportedly from Lingamaneni. (*Id.* 61–62.) Such conduct violated express company policy and was grounds for her immediate termination. (*Id.* 28–30, 63–65.) Because Plaintiff failed to put forward any specific and substantial evidence challenging the credibility of the Health System's motives, CareMore's Motion for Summary Judgment is **GRANTED** as to this claim.[4]

## B.   Intentional Infliction of Emotional Distress

Plaintiff also stated that she suffered extreme emotional distress based on CareMore's conduct and that she now suffers from a fear of Indian managers. (*Id.* 98) To prevail on a claim for intentional infliction of emotional distress, Plaintiff must be

---

[4] To the extent that Plaintiff's discrimination claim is based on retaliation, her claim similarly fails. (Third Am. Compl. ¶ 23.) Here, Plaintiff cannot establish a *prima facie* case of retaliation because even if her internal grievances were considered a protected activity, there is no evidence that the grievances are causally linked to her termination.

1   able to prove (1) that CareMore engaged in extreme and outrageous conduct with the

2   intention of causing, or reckless disregard of the probability of causing, her emotional

3   distress; (2) that she suffered severe or extreme emotional distress; and (3) that actual

4   and proximate causation of the emotional distress resulted from CareMore's

5   outrageous conduct. *See Hughes v. Pair*, 46 Cal. 4th 1035, 1051 (2009).   Plaintiff

6   cannot establish the first two elements of her claim.

7       *1.  Extreme and Outrageous Conduct*

8       Even if true, Health System's alleged conduct did not come close to "extreme

9   and outrageous," that is, "conduct that exceeded the bounds of what is generally

10  tolerated in a civilized society." *Braunling v. Countrywide Home Loans, Inc.*, 220

11  F.3d 1154, 1158 (9th Cir. 2000).   Conduct which exhibits mere rudeness and

12  insensitivity does not rise to the level required for a showing of intentional infliction

13  of emotional distress. *See Schneider v. TRW, Inc.*, 938 F.2d 986, 992–93 (9th Cir.

14  1991).

15      Even if Plaintiff could impute the conduct of Health System to CareMore, her

16  emotional distress claim fails as a matter of law.   Plaintiff identified a litany of

17  grievances regarding her work environment at Health System, none of which, alone or

18  taken together, constitute conduct that exceeds the bounds of what is tolerated in a

19  civilized society.   For example, she claims that Orito screamed at her three times over

20  ten months of employment, either about work or while asking if she is racist; that

21  Mehta referred to her as crazy and a drama queen, took credit for her work, stopped

22  working on her project for three months, and "stalked" her for a few seconds by

23  asking her to open an IRS statement while sitting on her desk; and that she received a

24  performance improvement plan.  (UF 90–96).

25      Personnel management decisions, such as Plaintiff's termination and the

26  imposition of a performance improvement plan, even if improperly motivated, cannot

27  give rise to an intentional infliction of emotional distress claim. *See Janken v. GM

28  Hughes Electronics*, 46 Cal. App. 4th 55, 80 (1996) ("[m]anaging personnel is not

outrageous conduct beyond the bounds of human decency, but rather conduct essential to the welfare and prosperity of society . . . . If personnel management decisions are improperly motivated, the remedy is a suit against the employer for discrimination.") *See also*, *Helgeson v. Am. Int'l Grp., Inc.*, 44 F. Supp. 2d 1091, 1095 (S.D. Cal. 1999) (in granting summary judgment for employer, found that employer's conduct, including threatening to place the plaintiff on a work program, not assigning the plaintiff a sufficient number of cases with which to meet her critical success goals, threatening to lay off the plaintiff, issuing the plaintiff two verbal reprimands that had no basis in fact, giving the plaintiff an inaccurate performance evaluation, and taking away assignments that were within the plaintiff's territory, were everyday management decisions that cannot form the basis of an intentional infliction of emotional distress claim).  Accordingly, to the extent that Plaintiff's claim is based on her termination or other personnel management decisions, it fails as a matter of law.

Plaintiff's remaining allegations regarding Mehta and Orito's alleged conduct, even taken together, do not amount to "extreme and outrageous conduct."  *See King v. AC & R Advert.*, 65 F.3d 764, 769–70 (9th Cir. 1995) (intentional infliction of emotional distress does not include efforts to change an employee's status and compensation, lack of interest in his history and role with the company, firing him, and supervisors making age-related comments, because poor judgment and poor manners are not so extreme as to exceed all bounds usually tolerated in a civilized society, even if offensive and perhaps discriminatory); *Schneider*, 938 F.2d at 992–93 (summary judgment for employer appropriate where supervisor screamed, yelled, and made threatening gestures at employee while criticizing her performance).

### 2. *Severe Emotional Distress*

Plaintiff also cannot demonstrate that she suffered severe emotional distress. "Severe emotional distress means 'emotional distress of such substantial quality or enduring quality that no reasonable [person] in civilized society should be expected to endure it.'"  *Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 1004 (1993)

1  (citations omitted).  Here, the emotional distress that Plaintiff claims to have suffered

2  is that she is now "always scared of Indians," specifically Indian managers and

3  companies who are "managed by Indians."  (UF 98–100.)  However, she has not

4  sought professional help because she wants to work through the issues on her own.

5  (*Id.* 98.)  Plaintiff's irrational fear of Indian managers, based on her belief that

6  Indians talk to each other to promote the idea that Americans are unemployable (*Id.*

7  101), does not constitute severe emotional distress.  *See Hughes*, 46 Cal. 4th at

8  1051 (plaintiff's assertions that she has suffered discomfort, worry, anxiety, upset

9  stomach, concern, and agitation as the result of defendant's comments do not

10 comprise emotional distress of such substantial quality or enduring quality that no

11 reasonable in civilized society should be expected to endure it).  Because no

12 reasonable jury could find otherwise, Plaintiff's claim fails as a matter of law.

13 **3. Defamation**

14    Even if Plaintiff had named Health System in this action, her defamation claim

15 would still fail because it is time-barred—all of the alleged defamatory statements

16 occurred outside of the statute of limitations period.  The only alleged defamatory

17 remarks Plaintiff identifies—all made while she was still employed by Health

18 System—are that: (1) Orito suggested that she was "racist" once during a one-on-one

19 meeting; (2) Mehta muttered "crazy" under his breath while she was speaking; and (3)

20 Mehta muttered under his breath "this is some drama queen," while they were talking

21 about work.  (UF 105–7.)

22    The alleged statements cited above all were made in or before September 2013;

23 Plaintiff did not file her lawsuit until March 2, 2015, over a year later.  Her

24 defamation claim is therefore barred by the one-year statute of limitations that applies

25 to California state law defamation claims and is dismissed as a matter of law.  *See* Cal.

26 Code Civ. Proc. § 340; *Stewart v. American Assoc. of Physician Specialists, Inc.*, 2015

27 WL 7722349, at *9 (C.D. Cal., Nov. 30, 2015) (Wright II, J.) (relying on Cal. Code

28 Civ. Proc. § 340 to grant summary judgment on a defamation claim filed more than

one year after the allegedly defamatory statements were made).

## V.   CONCLUSION

For the reasons discussed above, the Court **GRANTS** CareMore's Motion for Summary Judgment.  (ECF No. 40.)  The Clerk of the Court shall close the case.

**IT IS SO ORDERED.**

September 1, 2016

_____
**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**